Thomas J. GWIN, Plaintiff,

v.

BFI WASTE SERVICES, LLC, d/b/a Allied Waste Services of Birmingham, Defendant.

Civil Action No. 10–AR–0227–S.

United States District Court, N.D. Alabama, Southern Division.

April 16, 2010.

Kenneth Lee Cleveland, Cleveland & Cleveland PC, Ralph E. Coleman, Sr., Ralph E. Coleman PC, Birmingham, AL, for Plaintiff.

David T. Wiley, Rhonda S. Nabors, Jackson Lewis LLP, Birmingham, AL, for Defendant.

## MEMORANDUM OPINION AND ORDER

WILLIAM M. ACKER, JR., District Judge.

The complaint of Thomas J. Gwin ("Gwin"), against his former employer, BFI Waste Services, LLC, d/b/a Allied Waste Services of Birmingham ("BFI"), invokes both Title VII (42 U.S.C. § 2000e, *et seq.*), and the Age Discrimination in Employment Act ("ADEA") (29 U.S.C. § 621, *et seq.*). Gwin claims that he was discharged because of his being in two protected groups, first, members of the white race, and second, persons over forty years of age. BFI's motion to dismiss, now under consideration, points out that Gwin's claim, as reflected in the Equal Employment Opportunity Commission ("EEOC") file, cites "age" as the motivating factor for BFI's decision, and does not contain a specific charge of "race" discrimination. BFI seeks a dismissal of the Title VII aspect because the prerequisite of submission of such a charge to the EEOC has not been met; and in defense of the ADEA claim, BFI points out that this court in *Culver v. Birmingham Bd. of Educ.*, 646 F.Supp.2d 1270 (N.D.Ala.2009), has interpreted *Gross v. FBL Financial Services, Inc.*, — U.S. —, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009), to prevent an employee who complains under ADEA for an adverse employer action from claiming any other basis for the adverse action.

Gwin denies the accuracy and completeness of the EEOC file, and claims, to the contrary, that he vehemently insisted on pursuing his "race" claim and has never given it up. Because BFI's defense of "failure to exhaust the EEOC administrative remedy" is critical to Gwin's "race" claim, the court ordered an evidentiary hearing on the issue. Both parties agreed that this threshold dispute should be resolved by the court. If the court had been wise, it would have *sua sponte* impaneled an advisory jury.

Not unsurprisingly, the evidence offered by the two parties is, in some respects, the same, and in other respects is contradictory. Gwin testified as his only witness, but also offered portions of the EEOC file, plus a document identical to the charge document contained in the EEOC file, except with Gwin's initials beside the box designated "race", and containing two virtually merging signatures. The charge document in the official EEOC file contains an "x" only in the box entitled "age", but describes Gwin as "White", as well as age "56."

After Gwin rested his case, BFI offered, and the court received, the entire EEOC file, which did not contain what Gwin describes as his "amended charge". BFI offered the testimony of a single witness, Lashaunda Love ("Love"), the EEOC investigator who interviewed Gwin on October 20, 2009, and who was the only EEOC employee who evaluated Gwin's claim, and who recommended its denial. Although

the written evidence has been placed under seal at the request of the parties, it is necessary for the court to refer to the documentary evidence. To the extent the documents are employed in this opinion, the seal is LIFTED.

■ There are several items of evidence that cause the court to believe, and to find, that Gwin filed with the EEOC a claim of "race" discrimination adequate to pass the exhaustion test and to allow him to proceed in this court with his Title VII claim. Not necessarily in the order of their importance, but in chronological order, these items of evidence are:

(1) On October 20, 2009, Gwin came to the EEOC alone to complain about his termination by BFI on June 23, 2009. On the Intake Questionnaire that he completed at the front desk of the EEOC office in Birmingham, Alabama, Gwin, in his own handwriting, furnished the following information to the EEOC:

(a) Employer, BFI's business is "waste removal".

(b) BFI's Human Resources Director is Ronda Besher[sic], whose telephone number is (205) 923–1650.

(c) Gwin's job title is "swing driver".

(d) Gwin's immediate supervisor is "Sam Freeman, front-loader supervisor (Eric Cole)".

(e) In response to the question "What is the reason (basis) for your claim of employment discrimination?", Gwin checked both the box for "age" and the box for "race".

(f) In response to the question "What happened to you that you believe was discriminatory?", Gwin responded, "Fired by supervisor Eric Cole".

(g) In response to the question "Name and title of person responsible", Gwin replied "Sam Freeman (driver supervisor)".

(h) In the space following the word "action", Gwin wrote "took a statement from a new employee Shepherd Johnson which were hit and miss truths. Shepherd Johnson; said he was ofended[sic] by a story [indecipherable] employee (Steve Bradbury) told about and[sic] AfricanAmerican[sic] who once worked at job site (another driver). He Steve Bradbury, quoted the words of the older[sic] employee. I seen[sic] the look on Mr. Johnson[sic] face said it was proper to use the "N"-word in the quote!! And for this I was fired? ?"

(I) Gwin listed the following witnesses to the incident:

James S. Bradbury, Mechanic

Bill Strickland, Driver

Shepherd Johnson, Driver

(2) After reading the Intake Questionnaire, Love, the investigator, formally interviewed Gwin. Her subsequent typewritten Record of Interview reads as follows:

Charging Party (CP) visited the office of the U.S. Equal Employment Opportunity Commission, 1130 22nd Street South, Suite 2000, Birmingham, Alabama, on October 20, 2009, to file a charge of discrimination. CP alleges he was discriminated against because of his age, 56, in violation of the Age Discrimination in Employment Act of 1967, as amended.

CP is a White Male, 56 years of age, who worked for Allied Waste Steel (AWS) in Birmingham, Alabama. CP was hired on or about January 1983 as a Swing Driver. CP was discharged on June 23, 2009, for using a racial slur.

On June 16, 2009, CP stated Steve Bradbery, Bill Strickland, Sheppard Johnson,

and he was[sic] having a discussion. Mr. Bradberry is a mechanic who is 60 years of age. Mr. Strickland is a swing driver, age unknown. Mr. Johnson is a new employee hired as a driver who is 38 years of age.

CP stated Mr. Bradberry repeated a story previously told by a former employee of AWS. CP stated Mr. Bradberry repeated the work "nigger" that was used by the former employee. CP stated Mr. Johnson's demeanor indicated that the comment was offensive but Mr. Johnson did not say it was offensive. CP stated that he provided clarification by saying that the use of the word "nigger" is acceptable since Mr. Bradberry repeated the words of someone else. CP further stated Mr. Johnson reported the incident to a member of management. CP stated he was confronted by a member of management regarding the use of the racial slur. CP stated he denies calling anyone out their name [sic] but admits it was okay to use the racial slur in the aforementioned context. CP stated he was aware of company policy regarding the use of such language. CP contends he did nothing wrong.

CP stated he and Mr. Bradberry were terminated for using a racial slur, in violation of company policy.

CP stated he believes in the past a Black male who is also over the age of forty made a racial slur to a white female but he was not discharge [sic]. CP was given the opportunity to amend his charge and add race during the intake process but declined and requested to keep his charge as an age discrimination charge only.

CP was advised that it appears unlikely that any further investigation would dis-

close a violation of the law EEOC administers. CP was advised that if the charge is dismissed he will be issued a Notice of Right to Sue and that the Commission will consider this matter closed. CP was advised that the Notice gives him the opportunity to pursue his case in federal district court. CP was advised that if he decide [sic] to pursue his case in federal court, he must do so within 90 days from the date of his receipt of the Notice of Right to Sue if he so desires. CP stated he did not have additional information to provide.

Legal concurred with the no cause determination.

How long after the interview the Record of Interview was prepared by Love is not reflected in the record, but it obviously was typed after Love had reached her conclusion to recommend a "no cause determination", and after "legal" had "concurred". At the end of the interview with Gwin, and obviously before the Record of Interview was prepared. Love, employing the EEOC form entitled "Charge of Discrimination", listed the name of Gwin's employer as "AWS of Birmingham 802" (where the number 802 came from is anybody's guess), with phone number "(205) 923–1650", and placed an "x" only in the box beside the word "age". She did not check the box beside the word "race". In the space entitled "the particulars are", she typed:

I am a White male, and over the age of forty. I was employed by the above named employer for 26 years. On June 23, 2009, I was discharged for condoning the use of a racial slur made by my co-worker.

I am unaware of any other employee who used a racial slur and was not discharged. Another white employee who

is also a member of the protected age group was also discharged for using a racial slur.

I believe I was discriminated against because of my age, 56, in violation of the Age Discrimination in Employment Act of 1967, as amended.

(3) The EEOC records reflect that the original charge, as drafted by "CR/TIU on 10–20–2009", was "returned from legal on 10–21–2009".

(4) The EEOC records also reflect that "respondent's company representative" was Rhonda Brazil ("Brazil") with telephone number (205) 923–1650. On October 26, 2009, the EEOC mailed to "Brazil, Human Resources Director of AWS of Birmingham, 802", a Notice of Charge of Discrimination reflecting a charge of "age" discrimination by Gwin and saying, "No action is required at this time". On November 4, 2009, the EEOC mailed Gwin his Right–to–Sue letter. The following printed language was checkmarked:

> The EEOC issues the following determination: Based upon its investigation the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

A copy of this was also mailed to Brazil.

(5) Gwin testified, entirely consistent with what he articulated on his Intake Questionnaire, that he told Love that he was the victim of both "race" discrimination and of "age" discrimination. From the EEOC file, the court deduces that Gwin's proffered evidentiary basis for his "age" claim is a combination of the facts that at age 56, after 26 years of service, he and a fellow employee of 60, were fired, arguably indicating that the employer's suggestion of the uttering of a "racial slur" as its reason for the discharges, was pretextual, and that BFI had been laying in wait to find reasons to fire older employees. Gwin's arguable basis for a "race" claim, as deduced by the court, is that he is "white" and was discharged after engaging in a seemingly innocuous and arguably innocent conversation wherein **another** employee, Bradbury, used the word "nigger" (hereinafter "N"-word), quoting a story told by a former employee. There is no rendition of the entire conversation, the precise words used, by whom and to whom. The written and oral evidence on the subject leave the court perplexed and puzzled. The race of the various actors except for Gwin, and perhaps, Bradbury, are not shown. The extent and content of the conversation or conversations between BFI's decision-maker or decision-makers and Gwin preceding the termination are absent. Also absent is the disciplinary policy, if any, of BFI, except as perhaps implied by Gwin.

(6) Gwin testified that Love tried to dissuade him from pursuing his "race" claim while telling him that the EEOC would undoubtedly rule against him on the "age" claim. He testified that during the interview, Love wadded up one or more charge forms before completing the form that he finally signed. He testified that he continued vigorously to insist upon his "race" claim, even to the extent of re-signing the charge form (Plaintiff's Exhibit 4), which bears his duplicate signature in blue ink and containing his initials in the "race" box, whereas the copy from the EEOC file only checks the box entitled "race" and has one signature. The copy of the charging document in the EEOC file (Plaintiff's Ex-

hibit 3) is a photocopy and does not reflect the color of the ink used by Gwin in signing the form or forms at the conclusion of the interview. In other words, the original of the charge document was not offered by either party.

(7) Love testified, consistent with the EEOC records, that after she read the Intake Questionnaire, she listened to Gwin's story, and advised him that he didn't have a "race" claim and should only pursue an "age" claim. At the same time, she advised him that he would undoubtedly lose on his "age" claim. In other words, she processed two claims, whether dual or alternative, judging them both to be devoid of merit. In contradiction to Gwin's testimony, she testified, consistent with her subsequently prepared Record of the Interview, that Gwin voluntarily withdrew his "race" claim, and did not insist on checking the "race" box on the charge form when he signed dual copies, leaving the EEOC premises with only a charge document that checked "age" as the basis for his charge. Neither any document in the EEOC file nor any oral testimony indicates the BFI employment policies in place on June 23, 2009. Therefore, neither the EEOC (unless from another source), nor this court, knows whether BFI's employee handbook (if there is one) has a provision for progressive discipline, or for zero toleration for racist remarks, or for an internal review process. There is no evidence of Gwin's work or disciplinary history, except for his 26 years of continuous service. For aught appearing, Gwin had been a good, loyal and productive employee for 26 years until he **"condoned"** someone else's use of the "N"-word, which was used in repeating a story by an unnamed former employee. The actual story as told by Bradbury may or may not prove to be significant in this case.

(8) Between the time of the interview and the EEOC decision, Love, the investigator, made no attempt to contact any one of the three witnesses listed by Gwin, including Bradbury, and did not make contact with any supervisory employee of, or lawyer for, BFI, except by sending the Notice of Charge by U.S. Mail on October 26, 2009, to "AWS of Birmingham 802". The notice to BFI only referred to a charge of "age" discrimination, a charge, that, according to Love, she had already decided was without merit. In other words, no investigation, beyond what Love learned during the interview, was undertaken by the EEOC, and there was never any response from BFI to the EEOC until this action was filed.

(9) As stated, neither the EEOC file, nor any testimony, reflects that BFI had a strict and inalterable rule against racial slurs in the workplace, whether "racial slur" is defined in such a rule, whether uttered by a white in the presence of a black, by a black in the presence of a white, by a white in the presence of a white, or a black in the presence of a black. What is bad for the goose is, in most instances, bad for the gander. If a racist remark automatically results in termination, employees must understand what a racist remark consists of. From the record before this court, Gwin was both forthcoming about the incident with his employer and with the EEOC investigator. It is the **interpretation** of the incident, within the entire set of surrounding circumstances, that may or may not provide Gwin a *prima facie* case of race discrimination. Also, there is no evidence to suggest what BFI's policy is in the event an employee himself does not utter the "N"-word, except in a semantic discussion of the propriety of the word's usage by others. The court is left without any BFI

policy that might have triggered preemptory discharge of a Caucasian, or an African–American, or an Asian, or an East Indian, or an American Indian, or a Polynesian, or an Eskimo, or an Australian Aborigine, if he or she "condoned" usage of the word "honkey", or "whitey", or "kyke", or "spic", or "chicano", or "nigra" (a somewhat pervasive mispronunciation of the word "negro"), or "bojangles", or "stepinfetchit", or "darkie", or "colored", or "wetback", or "pollack", or "dago", or "wop", or "chink", or "gook", or "kraut", or "frog", etc. *ad nauseam.*

■ (10) There is nothing in the record to contradict Gwin's expressed belief that earlier a black BFI employee was not disciplined after making a racist remark. The mere absence of names and times, without any investigation either by Gwin or the EEOC, does not preclude the possibility of disparate treatment of whites by BFI based on their "race", using comparators. The hair-trigger discharge of a 56 year old and a 60 year old after what arguably was an innocuous and innocent remark by Bradbury that was only "condoned" by Gwin, arguably suggests age discrimination as a motive for both discharges. The EEOC did not obtain any response from BFI on either of Gwin's issues, probably because the Notice of Charge said, "No action is required", and only listed "age" as the reason given by the aggrieved party. What BFI would have done if it had received notice of a charge of "race" discrimination is a matter of speculation. The ages and races of the other BFI employees are not shown.

## CONCLUSIONS

If the original charge, as contained in the EEOC file, had been offered into evidence, or had otherwise been displayed to the court, the court would be in a position to compare the Gwin signatures on the competing charge documents, the one retained in the EEOC file, and the one offered by Gwin. It is impossible on the actual evidence as received to determine whether the same ink was used for both of Gwin's signatures. Although the EEOC file original might have been helpful, the court finds that such evidence is not necessary for reaching its decision.

The court finds that if Love was authorized to choose between Gwin's two charges, it is undisputed that she judged the ADEA claim the better claim, even while warning him that it, too, was a loser. At this stage of the procedure, the court cannot determine whether Gwin will be able to make out a *prima facie* case of "age" discrimination. The determination by the EEOC on this subject is, of course, not dispositive. The Intake Questionnaire makes abundantly clear Gwin's intent to charge both "race" and "age" discrimination. Love obviously concluded that neither of the claims was meritorious. She steered Gwin into what she, at the same time, found to be a blind alley.

The fact that the EEOC copy of the charge document, prepared by Love, described Gwin as "White" and recited that he "was discharged for condoning the use of a racial slur by my co-worker", leads this court to conclude that Gwin had a legitimate basis for insisting on his "race" claim, as well as his "age" claim. To be fired for "**condoning**" what another employee said should not provide an invariable basis for the employer to fire the "**condoning**" employee, especially if a member of another protected group has used similar language and not suffered such dire consequences. What discovery in this case may reveal on either the "age" or "race"

issue can now only be guessed at. Love may prove to have been as prescient as a haruspex with respect to both of Gwin's theories. Without any serious investigation, she made a putative choice for Gwin that this court will now force Gwin to make for himself.

With a prejudgment of the "age" discrimination claim, Love wrote in the charge typed up by her that Gwin was 56 years old when he was discharged, but included his race "White", a fact that is totally irrelevant to an "age" claim. She then, in effect, allowed him to admit that he had been terminated "for condoning the use of using a racial slur made by my coworker". What, exactly, does "condoning" in this context mean? Was it simply a dumb move? Perhaps. Was it deliberately calculated to hurt Johnson's feelings? Perhaps. Nobody is perfect, not Gwin, not BFI, not the EEOC, and not this court. Under BFI's rules, was it incumbent on Gwin to report to management Bradbury's use of the "N"-word while Bradbury was quoting an absent party? Would Johnson have been fired for **"condoning"** a racist remark if he had not reported on Bradbury and Gwin, and management had later found out about it? Love's report states that Gwin was given the opportunity to **"add"** a "race" claim, but that he declined. Gwin did not need to "add" a "race" claim. He had already made a "race" claim in his Intake Questionnaire. If he wanted to **"subtract"** or to **"withdraw"** his "race" claim, it would have been logical for the final draft of the charge document to reflect such a subtraction or withdrawal, so that Gwin would have clearly understood what he was signing. The absence of a disclaimer of "race" as a BFI motivation has significance. A person with Gwin's level of education may well have believed that the check in the "age" discrimination box did not preclude a separate claim of "race" discrimination. Nothing on the charge document says that the charging party is forever estopped from pursuing a claim not checked.

Because the question has not been explored, and the court cannot know what, if any, legitimate non-discriminatory reason BFI may give for its decision to terminate Gwin, this court finds that Gwin has exhausted his EEOC remedy as to a charge of "race" discrimination. In other words, the copy of the charge document, subpoenaed from the EEOC file, in which only the box entitled "age" is checked, is not dispositive of the exhaustion issue before this court. On October 20, 2009, Gwin may have left the EEOC exhausted, but he sufficiently exhausted the EEOC process. Without having to decide precisely whom to believe, as between the differing recollections of Gwin and Love, the court concludes that Gwin did, in fact, present to the EEOC a "race" claim that should not be foreclosed in this court on the basis of non-exhaustion.

In accordance with the foregoing, BFI's motion to dismiss the action insofar as brought under Title VII is DENIED. BFI shall answer the amended complaint **within seven (7) calendar days** after Gwin amends his complaint to eliminate either his ADEA claim or his Title VII claim. Gwin shall file his amended complaint **within fourteen (14) calendar days** of this date, and will be expected to do a better job of pleading than he did in his original complaint, which is not the epitome of lucidity. By electing between Title VII and ADEA, Gwin will not have waived any objection he may have to his being ordered to elect between statutory theories.

This schedule shall be interrupted if the parties jointly request mediation **within fourteen (14) calendar days.**