IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA18-1007

 Filed: 1 October 2019

Currituck County, No. 17 OSP 8518

JUDITH M. AYERS, Petitioner

 v.

CURRITUCK COUNTY DEPARTMENT OF SOCIAL SERVICES, Respondent

 Appeal by Respondent from Final Decision entered 13 June 2018 by

Administrative Law Judge Melissa Owens Lassiter in the Office of Administrative

Hearings. Heard in the Court of Appeals 26 March 2019.

 Hornthal, Riley, Ellis & Maland, L.L.P., by John D. Leidy, for petitioner-
 appellee.

 The Twiford Law Firm, by John S. Morrison, for respondent-appellant.

 HAMPSON, Judge.

 Factual and Procedural Background

 Currituck County Department of Social Services (DSS) appeals from a Final

Decision of the Administrative Law Judge (ALJ) reversing a Final Agency Decision

by DSS to terminate the employment of Judith M. Ayers (Petitioner) and further

requiring Petitioner be retroactively reinstated to her same or similar position with

DSS with full back pay and payment of reasonable attorneys’ fees. The Record before

us reflects the following:
 AYERS V. CURRITUCK CTY. DEP’T OF SOC. SERVS.

 Opinion of the Court

 Late in the afternoon on Friday, 3 November 2017, at approximately 4:45 p.m.,

Samantha Hurd (Hurd), Director of DSS, was working to compile statistics related to

DSS’s Child Protective Services Unit, including demographic information such as

race and gender of individuals and families with which DSS was engaged. In the

process of going though handwritten reports, Hurd identified several reports that

required some additional information or about which she had questions. As was the

customary practice, Hurd found Petitioner, the Supervisor of the Child Protective

Services Unit, to go through the reports about which Hurd had questions. On this

particular afternoon, Petitioner was working in a vacant office.

 One report Hurd had questions about involved the “F family.”1 On the intake

form for the F family, the assigned social worker had listed the letters “NR” under

the race category. Hurd did not recognize the abbreviation and knew Petitioner, as

the supervisor of the unit, would be able to obtain the information. Hurd asked

Petitioner what NR meant, and Petitioner replied she was unsure.2 Petitioner then

volunteered a suggestion as to a possible meaning. Hurd believed Petitioner said NR

 1 The family name is redacted from the Record to protect their privacy.
 2 Although the evidence tends to show NR was not a customary abbreviation used by DSS, it,
nevertheless, apparently did not occur to either of the two senior DSS employees that NR likely stood
for “None Reported,” “Not Recorded,” “No Response,” “No Reply,” or something similar, particularly in
the context of the overall form, which also included NR under the column for School/Child Care. Hurd
later determined the abbreviation did indeed stand for “None Reported.” Had either of the two made
this connection, all that follows may well have been avoided.

 -2-
 AYERS V. CURRITUCK CTY. DEP’T OF SOC. SERVS.

 Opinion of the Court

could mean “nigger rican.”3 The two left the vacant office to locate the actual file to

obtain the information. Embarrassed, Petitioner asked Hurd not to tell anyone what

had been said. Both Petitioner and Hurd are white females. Hurd later testified

Petitioner’s statement made “a significant impact” on her because it was vulgar,

crude, demeaning, and discriminatory, as it disparaged both African Americans and

Puerto Ricans.

 Over the ensuing weekend, Hurd conferred with an attorney for DSS and a

personnel consultant about the incident, as well as consulting an excerpt from a guide

on the imposition of discipline of North Carolina public employees. On Monday, 6

November 2017, Petitioner was summoned to a pre-dismissal conference with Hurd.

Petitioner was provided a written summary of the allegations, including the specific

allegation that Petitioner had used the phrase “n----- rican.” The written notice

asserted Petitioner’s alleged actions constituted “unacceptable personal conduct, in

that it was conduct for which no reasonable person should be expected to be warned

of in advance, the willful violation of known or written work rules, and conduct

unbecoming of an employee of [DSS].”

 3 It is important at this stage to note (as discussed below) Petitioner ultimately disputes that
she used this phrase, instead claiming she used a different iteration of the phrase. The ALJ, in the
Final Decision, found Petitioner used yet a third (and later a fourth) version of the phrase. Because
of these discrepancies and the underlying evidentiary disagreement between the parties, we set out
the offensive phrase here for context but will redact it for the remainder of the opinion.

 -3-
 AYERS V. CURRITUCK CTY. DEP’T OF SOC. SERVS.

 Opinion of the Court

 In correspondence presented to Hurd either prior to or at the 6 November 2017

pre-dismissal conference, Petitioner wrote:

 You stated that our meeting will be about the comment that I
 made on Friday afternoon. I made the comment directly to you
 while we were alone in the unoccupied social work office. You
 asked what a race ‘code’ meant that was hand written . . . [, and]
 we each paused attempting to decipher as it was not clear and it
 was said as a random guess. I immediately commented that I
 couldn’t believe I had just said that. I apologize for making that
 comment. I know the comment was unacceptable. It would be
 unacceptable in any setting, personal or professional.

 After receiving Hurd’s written notice of the allegations at the pre-dismissal

conference, Petitioner prepared a further written response disputing the events as

recounted by Hurd and the grounds for her potential dismissal, stating in part:

 Your synopsis is not exactly how I recall the exchange on
 November 3, 2017. I do not recall saying the words as they are
 spelled out in your letter, though I do not deny that I did say two
 unrelated words in the tone of answering a nonsensical word
 problem.

Petitioner went on to state: “Your assumption of my negative effect on the morale of

subordinates and service delivery are baseless. The syllables spoken were not used

to describe anyone. Separately or together they do not describe a race.”

 On 8 November 2017, Hurd issued a letter with her decision to terminate

Petitioner. This correspondence stated that during the pre-dismissal conference,

Petitioner “acknowledged using the words ‘n----- rican’ during your conversation with

me and described this as ‘totally inappropriate and unacceptable’.” The letter

 -4-
 AYERS V. CURRITUCK CTY. DEP’T OF SOC. SERVS.

 Opinion of the Court

concluded: “After consideration of all of this information I have decided to terminate

your employment with [DSS] for unacceptable personal conduct.”

 On 14 November 2017, Petitioner gave a written appeal to DSS, challenging

the grounds and procedure used in her termination. In this appeal, Petitioner wrote:

“You spell out in quotation marks what you claim I said. I did not say those remarks

as they are recounted by you.” Petitioner further stated: “You state that I

acknowledged using the words spelled out by you. I did not. I apologized for making

an illogical comment or ‘random guess’ that was unacceptable.” Petitioner then

asserted: “You state ‘at no time (in the pre dismissal conference) did you (I) deny using

the words’ that were spelled out. I did not deny nor did I agree with those words

spelled out by you.” On 21 November 2017, DSS, through Hurd, issued a Final

Agency Decision affirming the decision to terminate Petitioner’s employment.

 On or about 15 December 2017, Petitioner filed a Petition for Contested Case

Hearing alleging she had been dismissed from her employment by DSS “without just

cause or due process.” The matter was heard before the ALJ on 19 April 2018. During

this evidentiary hearing, Petitioner disputed that she had said: “n----- rican.” Rather,

she maintained she had used the phrase: “nigra rican.” For clarification, Petitioner’s

counsel asked her to spell the words Petitioner thought she used, to which Petitioner

spelled out: “n-i-g-r-a” and “r-i-c-a-n.” Petitioner explained:

 I guess I used neither of those words often or ever, and those
 words are in my word bank because of people in my family.

 -5-
 AYERS V. CURRITUCK CTY. DEP’T OF SOC. SERVS.

 Opinion of the Court

 My grandmother was from Norfolk, an old southern lady, and
 she would refer to negroes as nigra. And as kids we didn’t know
 if that was a good word or a bad word, but by our generation, it
 was close enough that we just didn’t say it unless we were
 imitating my grandmother.

 And rican, my brother-in-law is from Ecuador, and he lived in
 New York, so he would often tell stories or different situations
 about stereotyping the different Latin American community up in
 New York. And he would refer to people as rican.

 That’s the only -- I can't say I intended to say any of this, but
 those are the words that would be in my personal word bank.

 On cross-examination, Petitioner conceded this was the first time she had

expressly articulated what she believed she had said on 3 November 2017, despite

prior opportunities to straighten the record. “I felt like the situation -- the incident -

- I said something improper whether it was nigra or n-i-g-g-e-r. What she heard was

improper, what I said was improper, and I still accept that.” Petitioner went on to

state, “I wouldn’t allow my social workers to say that.”

 On 13 June 2018, the ALJ entered its Final Decision containing numerous

Findings of Fact and Conclusions of Law. In particular, as to the 3 November 2017

incident, the ALJ found:

 23. During the conversation between Petitioner and Ms. Hurd,
 Ms. Hurd asked more than once “what does this [‘NR’] mean?”
 Finally, Petitioner responded, “I think it means “Negra-Rican.”
 Petitioner believes she used the word “Negra” as her grandmother
 used that word to refer to African-Americans. Ms. Hurd believes
 Petitioner said the word “n-----”[.]

 -6-
 AYERS V. CURRITUCK CTY. DEP’T OF SOC. SERVS.

 Opinion of the Court

 The ALJ, having inserted a third iteration of the phrase into the record, further

found:

 47. Petitioner felt that she had used the word “Negra,” and
 conceded that at the time of the November 3, 2017 incident, and
 in all subsequent discussions about it. She also consistently
 conceded that using the word “Negra” was improper and
 unacceptable in a work setting. Ms. Hurd misunderstood
 Petitioner’s apology as an acknowledgement that she had used
 the “n” word which Ms. Hurd believed Petitioner said. However,
 Petitioner’s apology for saying “Negra” was not an
 acknowledgement by Petitioner that she had used the “n” word as
 Ms. Hurd alleged. Nonetheless, Ms. Hurd’s confusion was not
 material to the November 3, 2017 incident and did not cause Ms.
 Hurd to decide to dismiss or to discipline Petitioner.

 The ALJ then made Conclusions of Law, including analyzing the facts of the

case in light of Warren v. North Carolina Department of Crime Control, 221 N.C. App.

376, 726 S.E.2d 920 (2012), and Granger v. University of North Carolina, 197 N.C.

App. 699, 678 S.E.2d 715 (2009). The ALJ concluded:

 12. The undersigned agrees with the Fourth Circuit’s analysis in
 Spriggs v. Diamond Auto Glass that the use of the “n” word is far
 more than just a mere offensive utterance, and is a “pure
 anathema to African-Americans” that creates an abusive working
 and personal environment. . . . In this case, unlike Pamela
 Granger in Granger, supra., Petitioner did not use the “n” word
 in referring to another coworker in [DSS], but blurted out “Negra-
 Rican” while trying to interpret the “NR” abbreviation on a form
 during a private conversation with her supervisor. Unlike
 Pamela Granger, Petitioner did not say she “would not hire
 another black person,” was not overheard by one of her
 subordinate employees or any other employee at work, and did
 not expose [DSS] to embarrassment and potential legal liability.
 . . . Petitioner surprised herself by saying what she said,
 immediately regretted her statement, immediately told Ms. Hurd

 -7-
 AYERS V. CURRITUCK CTY. DEP’T OF SOC. SERVS.

 Opinion of the Court

 that she could not believe she had said that, and apologized to Ms.
 Hurd.

 13. While Ms. Hurd believed Petitioner spoke the “n” word during
 their private conversation on November 3, 2017, the greater
 weight of evidence demonstrated that Petitioner involuntarily
 blurted out the phrase “Negro-Rican” during a momentary lapse
 in judgment. Petitioner’s statement was not committed
 maliciously, was not meant or said for any racially-motivated
 reason, or with any racially motivated intent. Petitioner’s
 explanation for making that statement was credible and
 believable. Therefore, [DSS] failed to prove the first prong of
 Warren by failing to prove by a preponderance of the evidence that
 Petitioner engaged in the conduct alleged by [DSS].

 Based on Conclusion of Law 13,4 the ALJ concluded no further analysis was

required because DSS failed to even prove Petitioner engaged in the specific conduct

alleged by DSS. The ALJ, nevertheless, went on to conclude DSS also erred in the

Final Agency Decision by failing to give proper weight to the fact no one other than

Hurd overheard the comment on 3 November 2017 and by failing to give proper

weight to Petitioner’s lack of disciplinary history during her almost 11 years of

service.

 Based on the totality of the Findings of Fact and Conclusions of Law, the ALJ

determined:

 15. The relevant facts and mitigating factors, including, but not
 limited to, Petitioner’s disciplinary history, her years of service,
 prior job performance, and the lack of any harm sustained by
 Respondent, further supports a determination that Petitioner’s
 conduct does not rise to the level of conduct that would justify the

 4 Which now inserted a fourth iteration of the alleged comment as “Negro-Rican.”

 -8-
 AYERS V. CURRITUCK CTY. DEP’T OF SOC. SERVS.

 Opinion of the Court

 severest sanction of dismissal under the totality of facts and
 circumstances of this contested case.

The ALJ then ultimately concluded: “Based on the foregoing analysis, [DSS] lacked

just cause to dismiss Petitioner from employment . . . .” Consequently, the ALJ

reversed the Final Agency Decision and ordered Petitioner to be reinstated with full

back pay and reimbursement of attorneys’ fees. DSS timely filed Notice of Appeal

from the ALJ’s Final Decision.

 Appellate Jurisdiction

 The parties agree this case is subject to Article 8 of Chapter 126 of the North

Carolina General Statutes, titled “Employee Appeals of Grievances and Disciplinary

Action.” The parties also agree Petitioner qualifies as a “career State employee” and

thus is afforded the benefit of N.C. Gen. Stat. § 126-35(a), which provides in part: “No

career State employee subject to the North Carolina Human Resources Act shall be

discharged, suspended, or demoted for disciplinary reasons, except for just cause.”

N.C. Gen. Stat. § 126-35(a) (2017). Under this Statute, an employee has the right to

appeal first to the agency head to obtain a final agency decision and then, in turn,

seek review of the final agency decision in the Office of Administrative Hearings

(OAH). Id. Under Section 126-34.02, an employee aggrieved by the final agency

decision appeals to OAH by filing a contested case. Id. § 126-34.02(a) (2017).

Specifically, as was the case here, “[a] career State employee may allege that he or

she was dismissed, demoted, or suspended for disciplinary reasons without just

 -9-
 AYERS V. CURRITUCK CTY. DEP’T OF SOC. SERVS.

 Opinion of the Court

cause.” Id. § 126-34.02(b)(3). Following the ALJ’s final decision, an aggrieved party,

here DSS, is entitled to judicial review by appeal to this Court, as further provided

under N.C. Gen. Stat. § 7A-29(a). Id. § 126-34.02(a).

 Thus, this matter is before this Court on appeal from the ALJ’s Final Decision

under N.C. Gen. Stat. §§ 126-34.02(a) and 7A-29(a). Further, we note that while the

ALJ left open the issue of the amount of attorneys’ fees to be awarded to Petitioner,

this does not alter the final nature of the ALJ’s Final Decision for purposes of its

appealability under N.C. Gen. Stat. § 7A-29(a). See Duncan v. Duncan, 366 N.C. 544,

546, 742 S.E.2d 799, 801 (2013) (“An order that completely decides the merits of an

action therefore constitutes a final judgment for purposes of appeal even when the

trial court reserves for later determination collateral issues such as attorney’s fees

and costs.” (citation omitted)).

 Standard of Review

 “ ‘It is well settled that in cases appealed from administrative tribunals,

questions of law receive de novo review, whereas fact-intensive issues such as

sufficiency of the evidence to support an agency’s decision are reviewed under the

whole-record test.’ ” Harris v. N.C. Dep’t of Pub. Safety, ___ N.C. App. ___, ___, 798

S.E.2d 127, 132 (quoting N.C. Dep’t of Env’t & Natural Res. v. Carroll, 358 N.C. 649,

659, 599 S.E.2d 888, 894-95 (2004)), aff’d per curiam, 370 N.C. 386, 808 S.E.2d 142-

43 (2017).

 - 10 -
 AYERS V. CURRITUCK CTY. DEP’T OF SOC. SERVS.

 Opinion of the Court

 “Where the petitioner alleges that the agency decision was based on error of

law, the reviewing court must examine the record de novo, as though the issue had

not yet been considered by the agency.” Blackburn v. N.C. Dep’t of Pub. Safety, 246

N.C. App. 196, 207, 784 S.E.2d 509, 518 (2016) (citation and quotation marks

omitted). As such, “[u]nder a de novo review, the court considers the matter anew

and freely substitutes its own judgment for that of the [ALJ].” Id. (alteration in

original) (citation and quotation marks omitted).

 On the other hand, “[u]nder the whole record test, the reviewing court must

examine all competent evidence to determine if there is substantial evidence to

support the administrative agency’s findings and conclusions.” Henderson v. N.C.

Dept. of Human Resources, 91 N.C. App. 527, 530, 372 S.E.2d 887, 889 (1988) (citation

omitted). “When the trial court applies the whole record test, however, it may not

substitute its judgment for the agency’s as between two conflicting views, even

though it could reasonably have reached a different result had it reviewed the matter

de novo.” Carroll, 358 N.C. at 660, 599 S.E.2d at 895 (citation and quotation marks

omitted).

 Issues

 The relevant issues are (I) whether the ALJ’s Finding of Fact 23, regarding the

alleged conduct of Petitioner, is supported by substantial evidence in the Record; and

 - 11 -
 AYERS V. CURRITUCK CTY. DEP’T OF SOC. SERVS.

 Opinion of the Court

(II) whether the ALJ properly concluded that DSS failed to prove the first prong of

the Warren analysis—that Petitioner engaged in the conduct alleged by DSS.

 Analysis

 Before beginning our analysis of the ALJ’s Final Decision, it is helpful to review

the basic legal foundation for the Final Agency Decision, the ALJ’s Final Decision,

and thus our decision. As noted above, “[c]areer state employees, like petitioner, may

not be discharged, suspended, or demoted for disciplinary reasons without ‘just

cause.’ ” Warren, 221 N.C. App. at 379, 726 S.E.2d at 923 (quoting N.C. Gen. Stat. §

126-35(a)). By statute, “the burden of showing that a career State employee was

discharged, demoted, or suspended for just cause rests with the employer.” N.C. Gen.

Stat. § 126-34.02(d).

 The Administrative Code provides two bases for the statutory “just cause”

standard: “(1) Discipline or dismissal imposed on the basis of unsatisfactory job

performance, including grossly inefficient job performance[; and] (2) Discipline or

dismissal imposed on the basis of unacceptable personal conduct.” 25 N.C. Admin.

Code 1J.0604(b)(1)-(2) (2018). Here, Petitioner’s dismissal was based on allegations

of unacceptable personal conduct. The Administrative Code further defines

unacceptable personal conduct as:

 (a) conduct for which no reasonable person should expect to
 receive prior warning;

 - 12 -
 AYERS V. CURRITUCK CTY. DEP’T OF SOC. SERVS.

 Opinion of the Court

 (b) job-related conduct which constitutes a violation of state or
 federal law;

 (c) conviction of a felony or an offense involving moral turpitude
 that is detrimental to or impacts the employee's service to the
 State;

 (d) the willful violation of known or written work rules;

 (e) conduct unbecoming a state employee that is detrimental to
 state service;

 (f) the abuse of client(s), patient(s), student(s) or a person(s) over
 whom the employee has charge or to whom the employee has a
 responsibility or an animal owned by the State;

 (g) absence from work after all authorized leave credits and
 benefits have been exhausted; or

 (h) falsification of a state application or in other employment
 documentation.

25 N.C. Admin. Code 1J.0614(8)(a)-(h) (2018). Here, DSS asserted Petitioner’s

alleged unacceptable personal conduct included: (a) conduct for which no reasonable

person should expect to receive prior warning; (d) the willful violation of known or

written work rules; and (e) conduct unbecoming a state employee that is detrimental

to state service.

 This Court has articulated a three-part analytical approach to determine

whether just cause exists to support a disciplinary action against a career State

employee for alleged unacceptable personal conduct:

 The proper analytical approach is to first determine whether the
 employee engaged in the conduct the employer alleges. The

 - 13 -
 AYERS V. CURRITUCK CTY. DEP’T OF SOC. SERVS.

 Opinion of the Court

 second inquiry is whether the employee's conduct falls within one
 of the categories of unacceptable personal conduct provided by the
 Administrative Code. Unacceptable personal conduct does not
 necessarily establish just cause for all types of discipline. If the
 employee's act qualifies as a type of unacceptable conduct, the
 tribunal proceeds to the third inquiry: whether that misconduct
 amounted to just cause for the disciplinary action taken. Just
 cause must be determined based upon an examination of the facts
 and circumstances of each individual case.

Warren, 221 N.C. App. at 383, 726 S.E.2d at 925 (citation and quotation marks

omitted). The North Carolina Supreme Court has further emphasized that an

“appropriate and necessary component” of a decision to impose discipline on a career

State employee is the consideration of certain factors, including: “the severity of the

violation, the subject matter involved, the resulting harm, the [career State

employee’s] work history, or discipline imposed in other cases involving similar

violations.” Wetherington v. N.C. Dep’t of Pub. Safety, 368 N.C. 583, 592, 780 S.E.2d

543, 548 (2015).

 In this case, the ALJ concluded DSS failed to meet its burden under the first

prong of the Warren analysis because the ALJ found Petitioner uttered the phrase

“Negra-Rican” or “Negro-Rican” rather than “N----- Rican” as alleged by DSS; thus,

according to the ALJ, DSS failed to prove that Petitioner engaged in the conduct

alleged. The ALJ went on, however, to further conclude DSS committed errors in its

analysis of whether dismissal was the appropriate disciplinary measure by failing to

take into account whether anyone else overheard the comment and by failing to

 - 14 -
 AYERS V. CURRITUCK CTY. DEP’T OF SOC. SERVS.

 Opinion of the Court

consider Petitioner’s lack of any prior disciplinary history. Therefore, the ALJ

concluded in light of Petitioner’s disciplinary history, years of service, prior job

performance, and the lack of harm to DSS, under the totality of the circumstances,

dismissal was not warranted. As a result, the ALJ determined DSS lacked just cause

to dismiss Petitioner and reversed the Final Agency Decision.

 I. Finding of Fact 23

 DSS challenges a number of the ALJ’s Findings of Fact as unsupported by the

evidence. We, however, for purposes of this appeal need only address one of the

challenged Findings of Fact:

 23. During the conversation between Petitioner and Ms.
 Hurd, Ms. Hurd asked more than once “what does this
 [‘NR’] mean?” Finally, Petitioner responded, “I think it
 means “Negra-Rican.” Petitioner believes she used the
 word “Negra” as her grandmother used that word to refer
 to African-Americans. Ms. Hurd believes Petitioner said
 the word “n-----”[.]

It is apparent from the ALJ’s Final Decision that this was the critical finding driving

the ALJ’s analysis both in terms of applying the Warren factors and in its

consideration of the totality of the circumstances surrounding the imposition of

discipline on Petitioner.

 DSS argues the ALJ should have accepted Hurd’s testimony as more credible

because Petitioner only provided her version of the alleged comment for the first time

at the hearing before the ALJ. However, “[t]he credibility of witnesses and the

 - 15 -
 AYERS V. CURRITUCK CTY. DEP’T OF SOC. SERVS.

 Opinion of the Court

probative value of particular testimony are for the [ALJ] to determine, and [the ALJ]

may accept or reject in whole or part the testimony of any witness.” N.C. Dep’t of

Pub. Safety v. Ledford, 247 N.C. App. 266, 287, 786 S.E.2d 50, 64 (2016) (alterations

in original) (citation and quotation marks omitted).

 Nevertheless, we are compelled to conclude the ALJ’s Finding is still not

supported by the evidence in the Record, even relying solely upon Petitioner’s

testimony. Petitioner’s testimony was clear and unequivocal that the phrase she used

was “nigra rican” and not “Negra-Rican,” as found by the ALJ. Petitioner even spelled

out the phrase in response to her own attorney’s questioning. In addition, Petitioner

went on to explain:

 I guess I used neither of those words often or ever, and those
 words are in my word bank because of people in my family.

 My grandmother was from Norfolk, an old southern lady, and
 she would refer to negroes as nigra. And as kids we didn’t know
 if that was a good word or a bad word, but by our generation, it
 was close enough that we just didn’t say it unless we were
 imitating my grandmother.

 And rican, my brother-in-law is from Ecuador, and he lived in
 New York, so he would often tell stories or different situations
 about stereotyping the different Latin American community up in
 New York. And he would refer to people as rican.

 That’s the only -- I can't say I intended to say any of this, but
 those are the words that would be in my personal word bank.

 Thus, the ALJ’s Finding is not supported by the evidence in the Record. It is

then apparent the ALJ carried out the remainder of its analysis under the

 - 16 -
 AYERS V. CURRITUCK CTY. DEP’T OF SOC. SERVS.

 Opinion of the Court

misapprehension of the exact phrase used and that the ALJ’s understanding of the

exact phrase used was central to both the rest of the ALJ’s Findings and its

Conclusions of Law. Therefore, we vacate the ALJ’s Final Decision in its entirety and

remand this matter for the ALJ to reconsider its factual findings in light of the

evidence of record and to make new conclusions based upon those factual findings.

 II. Failure to Prove First Prong of Warren

 In particular, the ALJ’s erroneous Finding directly impacted its Conclusions of

Law 12 and 13:

 12. The undersigned agrees with the Fourth Circuit’s analysis in
 Spriggs v. Diamond Auto Glass that use of the “n” word is far
 more than just a mere offensive utterance, and is a “pure
 anathema to African-Americans” that creates an abusive working
 and personal environment. . . . In this case, unlike Pamela
 Granger in Granger, supra., Petitioner did not use the “n” word
 in referring to another coworker in [DSS], but blurted out “Negra-
 Rican” while trying to interpret the “NR” abbreviation on a form
 during a private conversation with her supervisor. Unlike
 Pamela Granger, Petitioner did not say she “would not hire
 another black person,” was not overheard by one of her
 subordinate employees or any other employee at work, and did
 not expose [DSS] to embarrassment and potential legal liability.
 . . . Petitioner surprised herself by saying what she said,
 immediately regretted her statement, immediately told Ms. Hurd
 that she could not believe she had said that, and apologized to Ms.
 Hurd.

 13. While Ms. Hurd believed Petitioner spoke the “n” word during
 their private conversation on November 3, 2017, the greater
 weight of the evidence demonstrated that Petitioner involuntarily
 blurted out the phrase “Negro-Rican” during a momentary lapse
 in judgment. Petitioner’s statement was not committed
 maliciously, was not meant or said for any racially-motivated

 - 17 -
 AYERS V. CURRITUCK CTY. DEP’T OF SOC. SERVS.

 Opinion of the Court

 reason, or with any racially motivated intent. Petitioner’s
 explanation for making that statement was credible and
 believable. Therefore, [DSS] failed to prove the first prong of
 Warren by failing to prove by a preponderance of the evidence that
 Petitioner engaged in the conduct alleged by [DSS].

 It is clear that based on its erroneous finding that Petitioner used the phrase

“Negra-Rican” or “Negro-Rican,” the ALJ concluded Petitioner had not used a racial

epithet intentionally or with racial animus but rather suffered only a momentary

lapse in judgment by offering an inappropriate response to her supervisor to the

question of the meaning of “NR.” Irrespective of whether the ALJ’s analysis on this

point stands on firm footing, the evidence in this case simply does not support these

conclusions.

 The evidence reflects Petitioner either used the word “n----- rican” or the

variant “nigra rican.” In any event, the phrase employed by Petitioner constitutes a

racial epithet. See Friend v. Leidinger, 588 F.2d 61, 68 (4th Cir. 1978) (Butzner, J.,

concurring in part and dissenting in part) (describing “nigras” as an epithet); see also

Gwin v. BFI Waste Services, LLC, 718 F. Supp. 2d 1326, 1332 (N.D. Ala. 2010)

(including “nigra” in a long string of racial epithets and referring to it as “a somewhat

pervasive mispronunciation of the word ‘negro’ ”); Webster’s Third New International

Dictionary 1528 (1971) (defining “nigra” as a version of negro “often taken to be

offensive”). We fail to see how using a variant of an epithet that is commonly

understood to be a complete anathema is any less of an anathema. See Spriggs v.

 - 18 -
 AYERS V. CURRITUCK CTY. DEP’T OF SOC. SERVS.

 Opinion of the Court

Diamond Auto Glass, 242 F.3d 179, 185 (4th Cir. 2001) (noting “n-----” is “pure

anathema to African–Americans”); Ayissi–Etoh v. Fannie Mae, 712 F.3d 572, 580

(D.C. Cir. 2013) (Kavanaugh, J., concurring) (“No other word in the English language

so powerfully or instantly calls to mind our country’s long and brutal struggle to

overcome racism and discrimination against African–Americans.”).

 Indeed, Petitioner conceded: “I felt like the situation -- the incident -- I said

something improper whether it was nigra or n-i-g-g-e-r. What she heard was

improper, what I said was improper, and I still accept that.” Prior to her dismissal,

Petitioner wrote to Hurd: “I apologize for making that comment. I know the comment

was unacceptable. It would be unacceptable in any setting, personal or professional.”

As such, Petitioner, herself, effectively conceded whichever variant she used was

improper and unacceptable. She also conceded in her testimony that she would not

permit her own subordinates to use such language.

 More to the point, this renders unsound the ALJ’s Conclusion that DSS failed

to meet the first prong of the Warren analysis. The purpose of requiring a specific

allegation of the conduct alleged to support disciplinary action is to provide the

employee with “a sufficiently particular description of the incidents [supporting

disciplinary action] . . . so that the discharged employee will know precisely what acts

or omissions were the basis of [her] discharge.” Blackburn, 246 N.C. App. at 209, 784

S.E.2d at 519 (alterations in original) (citations and quotation marks omitted). Here,

 - 19 -
 AYERS V. CURRITUCK CTY. DEP’T OF SOC. SERVS.

 Opinion of the Court

DSS’s allegations sufficiently informed Petitioner that the basis of her termination

was her use of a racial epithet in her conversation with Hurd. The fact Petitioner

only admitted to using a dialectic variant of the phrase alleged does not mean DSS

failed to prove Petitioner did not engage in the conduct alleged. We therefore

conclude under either version of the evidence, DSS met its initial burden of proving

Petitioner engaged in the conduct alleged under Warren. Consequently, we reverse

the ALJ’s conclusion that DSS “failed to prove the first prong of Warren[.]”

 It is further clear the ALJ’s conclusions and consideration of the “totality of the

circumstances” were also grounded in its misapprehension of the evidentiary record.

As such, on remand, the ALJ should make new findings of fact supported by the

evidence in the record and continue its analysis under Warren of whether Petitioner

engaged in unacceptable conduct constituting just cause for her dismissal or for the

imposition of other discipline.5 Warren, 221 N.C. App. at 383, 726 S.E.2d at 926;

Harris, ___ N.C. App. at ___, 798 S.E.2d at 138. “The [ALJ] may, in its discretion,

hold additional hearings in this matter.” Warren, 221 N.C. App. at 383, 726 S.E.2d

at 926.

 Conclusion

 5 Based on our decision vacating the ALJ’s Final Decision as unsupported by the evidence in
the whole record and remanding for additional proceedings, we express no opinion as to whether the
ALJ erred by ruling DSS lacked just cause to terminate Petitioner for the conduct alleged.

 - 20 -
 AYERS V. CURRITUCK CTY. DEP’T OF SOC. SERVS.

 Opinion of the Court

 Accordingly, for the foregoing reasons, we vacate the Final Decision and

remand this matter for new findings of fact and conclusions of law.

 VACATED AND REMANDED.

 Judge DIETZ concurs.

 Judge TYSON concurs in result with separate opinion.

 -2-
 No. COA18-1007 – Ayers v. Currituck Cty. Dep’t of Soc. Servs.

 TYSON, Judge, concurring.

 The majority’s opinion concludes the decision of the ALJ should be remanded

for further findings of fact.

 I. Background

 Petitioner Judith M. Ayers is a longtime employee of Currituck County DSS

and a career state employee. At the time of her hearing and termination, she was

Supervisor of the Child Protective Services Unit. She had never been previously

disciplined by DSS and had been consistently awarded exemplary performance

reviews.

 Ayers was considered “first choice” for the DSS director’s job but had turned it

down, which allowed Hurd to be promoted. Hurd worked as a subordinate to Ayers.

There is a history of “friction” between these two individuals. The factual inquiry

before the ALJ was and is solely the credibility of Ayers and Hurd, and DSS carries

the burden of proof.

 The evidence shows and the ALJ found Hurd approached Ayers late on a

Friday afternoon when no other employees were present to question the meaning of

a notation on a report Ayers did not prepare. After Ayers stated she did not know the

answer to Hurd’s question and declined to speculate, Hurd persisted and made the

allegation at issue.

 The ALJ weighed the credibility of the two witnesses and the evidence,

factually found and concluded DSS had failed to prove the first prong of the Warren
 AYERS V. CURRITUCK CTY. DEP’T OF SOC. SERVS.

 TYSON, J., concurring

test to support Ayers’ termination. Warren v. N.C. Dep’t of Crime Control, 221 N.C.

App. 376, 379, 726 S.E.2d 920, 923 (2012). The ALJ further found and stated the

relevant facts, including Ayers’ lack of disciplinary history, her years of exemplary

service, job performance and reviews, and the lack of any harm sustained by either

DSS or Hurd, in support of her conclusion DSS failed to carry its burden to show

Ayers’ conduct rose to the level of conduct to justify the sanction of dismissal.

 II. Standard of Review

 The majority opinion correctly states the standard of review from Harris.

Harris v. N.C. Dep’t of Pub. Safety, 252 N.C. App. 94, 99, 798 S.E.2d 127, 132, aff’d

per curiam, 370 N.C. 386, 808 S.E.2d 142 (2017) (“It is well settled that in cases

appealed from administrative tribunals, questions of law receive de novo review,

whereas fact-intensive issues such as sufficiency of the evidence to support an

agency’s decision are reviewed under the whole-record test.”).

 “It also is appropriate to note that the ‘whole record’ test is not a tool of judicial

intrusion; instead, it merely gives a reviewing court the capability to determine

whether an administrative decision has a rational basis in the evidence.” Brewington

v. N.C. Dep’t of Pub. Safety, 254 N.C. App. 1, 19, 802 S.E.2d 115, 128 (2017), cert.

denied, 371 N.C. 343, 813 S.E.2d 857 (2018) (citation and quotation marks omitted).

 Like the jury, the ALJ is the sole judge of the credibility of the witnesses and

the weight given to the evidence as the finder of fact. She is the only “lie detector” in

 2
 AYERS V. CURRITUCK CTY. DEP’T OF SOC. SERVS.

 TYSON, J., concurring

the hearing. State v. Looney, 294 N.C. 1, 26, 240 S.E.2d 612, 626 (1978) (quoting

United States v. Barnard, 490 F.2d 907 (9th Cir. 1973)) (describing the role of the jury

as finders of fact in a jury trial). Her resolutions of credibility, weight, and factual

findings, like the jury’s “verdict” or truth, are not open to appellate review. DSS

carries the burden to show prejudicial and reversible error on appeal.

 III. Issues

 The sole issues before the ALJ are the credibility of the two witnesses: one who

asserts the allegation and the other who denies it, and whether DSS carries and

sustains its burden of proof. The issues before this Court are not credibility, but: (1)

whether the ALJ’s findings of fact are supported by evidence presented to the ALJ;

and, (2) whether the ALJ erred by concluding just cause did not exist and reversing

DSS’ decision to terminate Ayers’ employment.

 IV. Analysis

 Career and non-exempt state employees may not be discharged, suspended, or

demoted for disciplinary reasons without “just cause.” Warren v. N.C. Dep’t of Crime

Control, 221 N.C. App. 376, 379, 726 S.E.2d 920, 923 (2012).

 This requires the reviewing tribunal to examine two things: (1) “whether the

employee engaged in the conduct the employer alleges”; and, (2) “whether that

conduct constitutes just cause for the disciplinary action taken.” N.C. Dep’t of Env’t

& Natural Res. v. Carroll, 358 N.C. 649, 665, 599 S.E.2d 888, 898 (2004) (citation

 3
 AYERS V. CURRITUCK CTY. DEP’T OF SOC. SERVS.

 TYSON, J., concurring

omitted). There are two categories of just cause for discipline: “unsatisfactory job

performance” and “unacceptable personal conduct.” Id.

 The ALJ weighed the credibility of the witnesses, considered all the evidence

in the “whole record,” and concluded DSS had failed to prove that the first prong of

the Warren test was met. The ALJ further stated the accuser-director had erred in

applying her own Warren test, and also noted Ayers’ exemplary reviews and past job

performance. DSS complains about these additional conclusions. These conclusions

and evidence are clearly part of the “whole record,” but DSS wholly fails to show these

statements or findings are error or explain its own failure to offer credible testimony

and carry its burden of proof.

 Our standard of review constricts appellate review to the legal conclusions of

the ALJ. We are not the “lie detector” judging the witnesses’ credibility, and may not

re-weigh the evidence. Nor may we consider or assert arguments never made before

the ALJ. The ALJ heard the evidence, weighed the credibility of the witnesses,

entered findings supported by the evidence, made a decision, and issued her

conclusions and ruling. Accepting, rejecting, or resolving any conflicts in the

witnesses’ testimony or the evidence is solely within the province of the ALJ as finder

of fact.

 On remand, based upon the whole record, the ALJ is entirely free to accept or

reject the testimony and judge the credibility of any witness, and weigh and resolve

 4
 AYERS V. CURRITUCK CTY. DEP’T OF SOC. SERVS.

 TYSON, J., concurring

all factual disputes in the evidence before her as the sole judge and finder of facts.

Ayers carries no burden at the hearing.

 It is for the ALJ and not within this Court’s prerogative or authority to

determine factually who said what. As noted in the majority’s opinion, nothing in

this Court’s opinion and mandate suggests, compels, directs, or orders a contrary

result from the ALJ previously ordered upon remand.

 5